UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
NOUAMANE SIDQUI,                                            :
                                                            :
                                  Petitioner,               :
                                                            :        25-CV-9349 (VSB)
                        -against-                            :
                                                            :        **<u>OPINION & ORDER</u>**
JUDITH ALMODOVAR, in her official                           :
capacity as Acting New York Field Office                    :
Director, U.S. Immigration & Customs                        :
Enforcement, *et al.*,                                      :
                                                            :
                                  Respondents.  :
                                                            :
------------------------------------------------------------X

<u>Appearances</u>:

Michael Z. Goldman
The Law Offices of Michael Z. Goldman
New York, NY
*Counsel for Petitioner*

Brandon H. Cowart
United States Attorney's Office, Southern District of New York
New York, NY
*Counsel for Respondents*

<u>VERNON S. BRODERICK, United States District Judge</u>:

        Before me is Nouamane Sidqui's ("Sidqui" or "Petitioner") petition for a Writ of Habeas

Corpus under 28 U.S.C. § 2241 challenging the lawfulness of his detention by Immigration and

Customs Enforcement ("ICE") and seeking an order directing the Government to immediately

release Petitioner from custody.  (Doc. 1 ("Petition").)  Because I find that the Government

detained Petitioner pursuant to 8 U.S.C. § 1226 and that his detention violated his due process

rights, the Petition is GRANTED, and the Government is ordered to immediately release

Petitioner from custody.

# I.  **Factual and Procedural Background**

## A.  *Petitioner's Entry into the United States and Application for Asylum*

Sidqui is a citizen of Morocco who entered the United States on August 7, 2024 by crossing the border without inspection in Santa Teresa, New Mexico.  (Doc. 14-1 ("Record of Deportable/Inadmissible Alien") at 1; Doc. 12 ("Opposition" or "Opp'n") at 1; Doc. 13 ("James-Townend Decl.") ¶ 4.)  A Customs and Border Protection ("CBP") agent "encountered Petitioner" at the El Paso, Texas Border Patrol Sector and subsequently detained him.  (Record of Deportable/Inadmissible Alien 1; Opp'n 1; James-Townend Decl. ¶ 4.)  On August 10, 2024, CBP served Petitioner with (1) a Form I-860 Notice and Order of Expedited Removal charging him as inadmissible to the United States under the Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(I) and ordering his removal pursuant to INA § 235(b)(1), 8 U.S.C. § 1225(b)(1) and (2) a Notice to Alien Ordered Removed/Departure Verification, giving notice that Petitioner was prohibited from entering the United States for five years from the date of his removal because he was found inadmissible under § 1225(b)(1).  (James-Townend Decl. ¶ 6; Doc. 14-2 ("Notice and Order of Expedited Removal") at 1; Doc. 14-3 ("Notice to Alien Ordered Removed").)

On August 21, 2024, Petitioner stated that he feared persecution if he returned to Morocco.  (James-Townend Decl. ¶ 8.)  On August 26, 2024, Petitioner was interviewed by an asylum officer from U.S. Citizenship and Immigration Services ("USCIS"), who determined that Petitioner had a credible fear of returning to Morocco.  (*Id.*)

On August 28, 2024, USCIS served Petitioner with a Notice to Appear, (Doc. 14-4 ("NTA")), placing him in removal proceedings, where he could pursue his defensive asylum claim.  (James-Townend Decl. ¶ 9.)  The NTA has three check boxes to designate a noncitizen in

removal proceedings:  "arriving alien," "alien present in the United States who has not been admitted or paroled," or noncitizens who "have been admitted to the United States, but are removable for reasons stated below" in the form.  (NTA 1.)  Petitioner was designated as an "alien present in the United States who has not been admitted or paroled."  (*Id.*)  The NTA charged Petitioner as being inadmissible under INA § 212(a)(7)(A)(i)(I), codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I), due to inadequate documentation "at the time of application for admission"; and inadmissible under INA § 212(a)(6)(A)(i), codified at 8 U.S.C. § 1182(a)(6)(A)(i), as a noncitizen "present in the United States without being admitted or paroled," or one "who has arrived in the United States at any time or place other than as designated by the Attorney General."  (*Id.*)  The NTA vacated the previous Notice and Order of Expedited Removal.  (*Id.* ("Section 235(b)(1) order was vacated pursuant to: 8CFR 208.30").)  The NTA placed Petitioner in removal proceedings and ordered him to appear in front of an immigration judge on September 17, 2024.  (*Id.*)

### B.  *Petitioner's Initial Release from Custody*

On September 17, 2024, Petitioner appeared at an initial master hearing in Immigration Court.  (James-Townend Decl. ¶ 11.)  On September 19, 2024, Petitioner was placed into the Alternative to Detention ("ATD") program,[1] the Wrist Worn GPS Program, and released "on parol[e]" from ICE custody on September 20, 2024.  (Opp'n 7; *see also* James-Townend Decl. ¶¶ 12–13; Notice To EOIR: Alien Address, (Doc. 14-5) ("Released from ICE custody on the following condition(s):" "Other" "Parole").)  The NTA does not indicate under which statute Petitioner was released and the Government has not provided any documentation

---

[1] The Government elsewhere refers to the program as the Intensive Supervision Appearance Program ("ISAP"). (*See* Opp'n 7; Doc. 21 at 1; Doc. 28 at 1–2.)

contemporaneous to Petitioner's release indicating the same.  Indeed, the Government did not

file any documentation related to Petitioner's release, such as a Form I-286 Notice of Custody

Determination[2] or an Order of Release,[3] which would shed light on the statutory authority for

Petitioner's release on parole.  *See Ye v. Maldonado*, No. 25-CV-6417, 2025 WL 3521298, at *5

(E.D.N.Y. Dec. 8, 2025) (noting that "[t]he Notice of Custody Determination (Form I-286) and

Order of Release on Recognizance (Form I-220A) indicate that the petitioner was released on

recognizance in accordance with section 236 of the INA" (internal quotation marks omitted and

alterations adopted)); *Tumba v. Francis*, --- F. Supp. 3d ---, No. 25-CV-8110, 2025 WL

3079014, at *1 (S.D.N.Y. Nov. 4, 2025) (noting that the petitioner was served "with a Warrant

for Arrest of Alien, Form I-220; an Order of Release on Recognizance, Form I-220A; and a

Notice of Custody Determination, Form I-286, ordering her to appear for any hearing or

interview"); *Artiga v. Genalo*, No. 25-CV-5208, 2025 WL 2829434, at *6 (E.D.N.Y. Oct. 5,

2025) (noting that the petitioner's "notice of custody determination ordered him released him on

bond" and citing an "Order of Release on Bond"); *Villegas ex rel. Guzman Andujar v. Francis*,

No. 25-CV-09199, 2025 WL 3215597, at *6 (S.D.N.Y. Nov. 18, 2025) (noting that the

petitioner's "Order of Release on Recognizance explicitly states" that he was "released on his

---

[2] According to ICE's Enforcement and Removal Operations Bond Management Handbook: "A DHS official issues a Form I-286 – *Notice of Custody Determination* pursuant to section 236 of the INA to notify the alien whether he or she will be detained in custody, released under an immigration bond, or released on his or her own recognizance while a removal proceeding is ongoing.  This form is served on the alien, typically at the same time a Notice to Appear setting forth the reasons why the alien is subject to removal from the United States, is served on the alien."  U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations Bond Management Handbook (Aug. 19, 2024), https://www.ice.gov/doclib/foia/dro_policy_memos/eroBondManagementHandbook2018-ICFO-31476.pdf.  The Government filed the NTA in this case, (Doc. 14-5), but did not file a Form I-286 Notice of Custody Determination.

[3] CBP and ICE "issue a Form I-220A, Order of Release on Recognizance[], to aliens who have been placed in removal proceedings and then released on their own recognizance."  U.S. Citizenship and Immigration Services, Commonly Used Immigration Documents, https://www.uscis.gov/save/current-user-agencies/commonly-used-immigration-documents#:~:text=U.S.%20Customs%20and%20Border%20Protection%20(CBP)%20and%20U.S.%20Immigratio n%20and,released%20on%20their%20own%20recognizance.

own recognizance as a form of 'conditional parole' under § 1226"). The Government asserted that "ICE [] reviewed Petitioner's entire A-file" and "[u]nfortunately, ICE has not been able to identify the statutory basis upon which Petitioner was released on 'parole.' Nor do any other documents in Petitioner's A-file identify the statutory basis of his release." (Doc. 28 at 2.)[4] Upon his release from custody, Petitioner moved to New York.[5]

On September 30, 2024, "Petitioner's ATD Program Details changed and he was placed into Monthly Biometric Reporting." (James-Townend Decl. ¶ 15.) On October 1, 2024, Petitioner went to the Queens office of "BI Incorporated, the contractor which manages ICE's Intensive Supervision Program and was placed on monthly reporting on his personal phone as a component of ATD." (*Id*. ¶ 16.) Petitioner was not otherwise required to physically report to BI Incorporated ("BI Inc.") as a condition of his ATD Program. (Doc. 28 at 1.) The Government states that the last time Petitioner complied with his monthly telephonic reporting requirements was on February 28, 2025. (James-Townend Decl. ¶ 19.) Other than the Declaration of Deportation Officer James-Townend, the Government did not provide any evidence to establish that Petitioner failed to comply with the terms of his ISAP program after February 2025. (*See id.*) While the Government alleges that Petitioner's last electronic check-in was February 28, 2025, (*id.*), Petitioner states that he electronically checked-in "[e]very month throughout 2025,"

---

[4] The Government states that "[o]n September 20, 2024, Petitioner was released from ICE custody [and] [t]hat same day, ICE filed a Notice with the Immigration Court of Petitioner's release." (James-Townend Decl. ¶ 13.) The Government, however, did not file such notice in this case or explain why the notice was not being filed.

[5] On September 28, 2025, Petitioner filed a Form EOIR-33, Change of Address with the Immigration Court, indicating that he moved to New York. (James-Townend Decl. ¶ 14.) Respondents attached a Notice to EOIR: Alien Address form dated September 20, 2024, which included a Texas address for Petitioner "[u]pon release from ICE custody." (Doc. 14-5.) This document also notes that Petitioner was "[r]eleased from ICE custody on the following condition[:] Parole." (*Id.*) The Government did not file the Form EOIR-33, Change of Address, dated September 28, 2025 as an exhibit to the Opposition; they filed a Form EOIR-33 dated September 20, 2024, which appears to be from the week before Petitioner moved to New York. Instead, the September 28, 2025 Form EOIR-33 was described in the James-Townend Declaration. (*See* James-Townend Decl. ¶ 14.)

(Doc. 25).  Notably, "ICE is unable to determine when it learned of [P]etitioner's noncompliance."  (Doc. 21 at 1.)

On October 9, 2024, Petitioner filed his Form I-589, Application for Asylum, Withholding and Protection under the Convention Against Torture with the Immigration Court. (James-Townend Decl. ¶ 17).[6]

### C. *Petitioner's Arrest by the New York City Police Department*

On March 21, 2025,[7] Petitioner was arrested by the New York City Police Department in Queens for the following offenses:  (1) Strangulation in the Second Degree, Obstruct Breath/Blood Circulation – Cause Physical Injury, in violation of New York Penal Law ("NYPL") § 121.12(D); (2) Criminal Mischief in the Third Degree, Damage Another Person's Property in amount greater than $250.000, in violation of NYPL § 145.05(02); and (3) Assault in the Third Degree, with Intent to Cause Physical Injury, in violation of NYPL § 120.00(01). (James-Townend Decl. ¶ 20.)  Later that same day, Petitioner was arraigned in Queens County Criminal Court on the following charges:  (1) Assault in the Third Degree, with Intent to Cause Physical Injury, in violation of NYPL § 120.00(01); (2) Criminal Obstruction of Breathing or Blood Circulation-Apply Pressure, in violation of NYPL § 121.11(A); (3) Criminal Mischief, Intent to Damage Property, in violation of NYPL § 145.00(01); and (4) Harassment in the Second Degree, Physical Contact, in violation of NYPL § 240.26(01).  (*Id*. ¶ 21; *see also* Doc. 16-2.)

---

[6] Petitioner's counsel represented at the November 24, 2025 Order to Show Cause Hearing ("OTSC Hearing") that Petitioner has a hearing connected to his asylum application in March 2026.  (*See* Transcript from Nov. 24, 2025 OTSC Hearing ("Tr.") at 3:2-25.)

[7] The Government states that Petitioner was arrested by the New York City Police Department on March 21, 2025, (Opp'n 8; James-Townend Decl. ¶ 20), although the Certificate of Disposition from Queens Criminal Court states that the arrest date was March 31, 2025, (Doc. 16-2).  The Government could not explain this discrepancy at the OTSC Hearing.  (Tr. 4:18-5:5.)  However, there is no dispute that Petitioner was released on his own recognizance on March 31, 2025.  (*See* Opp'n 8.)

On March 31, 2025, while Petitioner was still in state custody, a Form I-247A, ICE

Detainer, was lodged with the New York City Queens Central Booking, which was not honored,

and Petitioner was released on his own recognizance on March 31, 2025.  (James-Townend Decl.

¶ 22.)[8]  The charges were subsequently dismissed on July 2, 2025, (Doc. 16-2 ("Certificate of

Disposition").)[9]  The Government states that it was not aware that the charges were dismissed at

the time of Petitioner's November 7, 2025 arrest.[10]  (Tr. 9:3-9.)  The Government states that it

did not run Petitioner's Record of Arrests and Prosecutions ("RAP") sheet and instead relied on

information put into a centralized system by the Federal Bureau of Investigation.  (*Id*. at 9:10-

16.)

### D.  *Petitioner's Arrest by ICE*

On October 17, 2025, Petitioner was "terminated from the ATD Program due to his

failure to comply with monthly telephonic reporting requirements."  (James-Townend Decl. ¶

23.)[11]  The Government alleges that Petitioner had "poor compliance" with the ISAP program

because he "satisfied the monthly reporting requirements for only five months, from October

2024 to February 2025."  (Opp'n. 8.)  Other than the Declaration of Deportation Officer James-

Townend, the Government did not submit any evidence to establish that Petitioner failed to

comply with the terms of the ISAP program after February 2025, (*see* James-Townend Decl. ¶

19), although Petitioner asserts that "[e]very month throughout 2025, he would 'check in' with

---

[8] The Government contends that "ICE became aware of the arrest on March 31, 2025" because Petitioner's
fingerprints were placed into an FBI database that "alerted ICE of [P]etitioner's arrest." (Doc. 21 at 1.) "ICE
lodged an immigration detainer with NYPD before [P]etitioner was released." (*Id*.)

[9] At the OTSC Hearing, Petitioner's counsel represented that the charges were dismissed on July 2, 2025, and the
Certificate of Disposition was created on July 18, 2025. (*See* Tr. 9:17-10:7; *see also* Doc. 16-2.)

[10] The parties did not identify why the charges were dismissed.

[11] While the Government alleges that Petitioner's last electronic check-in was February 28, 2025, (James-Townend
Decl. ¶ 19), Petitioner states that he electronically checked-in "[e]very month throughout 2025," (Doc. 25).

ICE on his electronic app. from his phone," (Doc. 25).  The Government similarly did not

provide records indicating BI Inc.'s notification to ICE regarding Petitioner's alleged failure to

check in electronically or BI Inc.'s records indicating such alleged failure.  It is unclear whether

Petitioner was notified that he was terminated from the ATD Program or what transpired

between the last time that Petitioner allegedly complied with the ATD Program and his

subsequent termination seven and a half months later.  "Although BI Inc. notifies ICE when a

noncitizen stops complying with the ISAP conditions, ICE does not know when BI Inc. provided

the notice as to Petitioner's noncompliance nor why approximately seven months elapsed after

the last time Petitioner checked in (February 28) before ICE acted on this information on

October 17, 2025, by terminating Petitioner from the ISAP."  (Doc. 28 at 1.)

On November 7, 2025, Petitioner went to the Queens office of BI Inc. although he was

not required to physically check-in at the BI Inc. office as a condition of his ATD.  (Doc. 28 at

1.)  Petitioner asserts that he went to the BI Inc. office because the electronic application he used

to check-in stopped working for him in November 2025 and when he called a phone number

listed in the electronic application, someone "told him to come to the BI Inc[.]" office in Queens

"so they could fix the app[lication] for him."  (Doc. 25.)  Instead, when he appeared at BI Inc.'s

office, a staff member alerted ICE that Petitioner, "who ICE had terminated from the ISAP

program on October 17," was at their office.  (Doc. 28 at 1.)  Since ICE officers are not stationed

at the BI Inc. office, ICE prepared an arrest warrant at 26 Federal Plaza in Manhattan and then

dispatched officers to the BI Inc. office in Queens to arrest Petitioner.[12]  (*Id*. at 1–2.)  "ICE

officers confirmed Petitioner's identity based on a BI Inc. employee positively identifying

---

[12] The Government did not provide the specific timing between the BI Inc. employee alerting ICE that Petitioner was at the BI Inc. office and the issuance of the Arrest Warrant, (*see* Doc. 28 at 1–2); however, Petitioner reported to his attorney that when he arrived at the BI Inc. office, "[h]e waited approximately 30 minutes" until "ICE showed up and took him to 26 Federal Plaza," (Doc. 25).

Petitioner and identification Petitioner provided." (*Id*. at 2.) ICE arrested Petitioner pursuant to a Form I-200, Warrant for Arrest of Alien. (James-Townend Decl. ¶ 24; *see also* Doc. 14-6 ("Arrest Warrant")[13].) Petitioner was not given notice that he would be detained prior to his arrest. (Tr. 28:5-12.) The Government asserts that Petitioner "was detained for violating a condition of his release from custody, *i.e.*, non-compliance with the ISAP program; and for his criminal history." (Doc. 28 at 2.) The Government states that it was not aware that Petitioner's criminal charges were dismissed at the time of Petitioner's arrest. (Tr. 9:3-9.)

Petitioner was transported to ICE's processing space at 26 Federal Plaza before being transported to Orange County Jail in Goshen, New York at approximately 4:00 p.m. EST on November 8, 2025. (James-Townend Decl. ¶¶ 25–26.) Petitioner has been detained since November 7, 2025 without an individualized bond hearing. (Pet. ¶ 2.)

### E. *Petitioner Files Habeas Petition*

On November 9, 2025, Petitioner filed this Petition, (Pet.), along with a Proposed Order to Show Cause, (Doc. 2). On November 12, 2025, I issued an Order to Show Cause, setting the Order to Show Cause hearing (the "OTSC Hearing") for November 24, 2025, directing the Government to respond to the Petition by November 17, 2025, and allowing Petitioner to file a reply by November 20, 2025. (Doc. 4.) On November 14, 2025, the Government filed a letter motion requesting an extension of time until November 20, 2025, (Doc. 6), which I granted on November 17, 2025, and gave Petitioner a one-day extension to file his reply, (Doc. 8). On November 21, 2025,[14] the Government filed its opposition brief, (Doc. 12), along with a declaration of ICE

---

[13] The Arrest Warrant states that it was served on Petitioner at "New York, NY" not Queens, NY where the BI Inc. office was located. (Doc. 14-6.)

[14] On November 21, 2025, Respondents filed a letter motion requesting a *nunc pro tunc* extension of time because the Opposition was filed approximately five hours late, (Doc. 15), which I granted, (Doc. 18).

Deportation Officer Justin James-Townend, (Doc. 13), and a response to the Petition, (Doc. 14), which attached six exhibits:  (1) Form I-213, Record of Deportable/Inadmissible Alien, (Doc. 14-1), (2) Form I-860, Notice and Order of Expedited Removal, (Doc. 14-2), (3) Form I-296, Notice To Alien Ordered Removed, (Doc. 14-3), (4) Form I-862, Notice to Appear, (Doc. 14-4), (5) Form I-830E, Notice To EOIR: Alien Address, (Doc. 14-5), and (6) Form I-200, Warrant for Arrest of Alien, (Doc. 14-6).  On November 21, 2025, Petitioner filed his reply in support of the Petition, (Doc. 16 ("Reply")), along with two exhibits:  an appendix created by Judge Paul S. Diamond in the Eastern District of Pennsylvania documenting 288 decisions rejecting the Government's position that non-citizens who entered the country unlawfully are subject to mandatory, no-bond detention under § 1255(b), (Doc. 16-1), and the Certificate of Disposition from Queens Criminal Court, (Doc. 16-2).

I held the OTSC Hearing on November 24, 2025.  I began the hearing by asking a series of questions, including questions intended to confirm the timeline of events and that there were no factual disputes between the parties.  (*See generally* Tr. 2-14.)  I then asked various questions in connection with the applicability of §§ 1225 and 1226 to Petitioner's initial detention and subsequent re-detention.  (*See id.* at 14-35.)  During oral argument, the Government confirmed that "the agency position is that" Petitioner's "status was as it was when [he was] arrested."  (Tr. 15:3-8, 14:17-22 (explaining that the Government's basis for the argument that Petitioner is detained under § 1225 is "[b]ecause that's the statutory provision he was arrested under initially."); *id.* at 21:14-18 ("[T]he agency's view is that once he's arrested, and the authority he is being arrested under is 1225(b)(1) in this case, that doesn't change, even though he is being put into more formal removal proceedings which are associated with the authority to detain under 1226.").)  In other words, the Government's position is that Petitioner is subject to

mandatory detention under § 1225(b)(1) because when he was apprehended shortly after entering the country, he was present without being "admitted" and is thus an "applicant for admission." (*See id.* at 15:3-12; *see also* Opp'n 13 ("Though he was physically present in the United States when he was arrested, because Petitioner entered the United States unlawfully and was never admitted into the country, he is treated, for constitutional purposes, as if stopped at the border." (internal quotation marks omitted)).)  Thus, the Government's argument is essentially that once a noncitizen is deemed an "applicant for admission," under § 1225(b)(1) they retain that status until they are deemed to have lawfully entered the country, if ever.  (*See* Tr. 15:3-12, 33:8-14.)  I then heard additional argument from Petitioner, (*id.* at 43:17-44:7), and the Government did not choose to present any further argument, (*id.* at 44:10-12).  During the OTSC Hearing, I asked the Government several questions and requested that counsel for the Government submit a supplemental letter with responses to the questions I asked.  (*See generally* Tr.)

On December 9, 2025, the Government filed its first supplemental declaration in response to the questions I asked during the OTSC Hearing.  (Doc. 21.)  The Government's first supplemental declaration did not address the majority of the questions I asked during the OTSC Hearing.  Therefore, on December 10, 2025, I ordered the Government to submit a second supplemental declaration.  (Doc. 22.)  On December 12, 2025, Petitioner's counsel submitted a letter explaining why Petitioner was physically present at the BI Inc. office on November 7, 2025.  (Doc. 25.)  On December 15, 2025, the Government submitted a second supplemental declaration in response to the questions I raised during the OTSC Hearing and in the December 10, 2025 order.  (Doc. 28.)  On December 16, 2025, Petitioner's counsel filed a letter in response to the Government's second supplemental declaration taking issue with the factual assertions in the supplemental declaration and providing additional authority for Petitioner's position that he

is detained pursuant to § 1226.  (Doc. 29.)  On January 8, 2026, Petitioner's counsel filed a letter

in light of my recent statement in another case, *Han v. Noem*, that "I am inclined to agree with

the more than dozen decisions in this District that have applied Section 1226(a) and ruled in

favor of the petitioner in circumstances similar to this case, where petitioner was detained while

living in the United States and has a pending asylum application," No. 25-CV-10753, 2026 WL

18704, at *1 n.1 (S.D.N.Y. Jan. 2, 2026).  (Doc. 30.)  Petitioner's counsel asserted that this

statement "directly controls Petitioner's case."  (*Id.*)  However, the Government's position in

*Han* is that the petitioner there is detained under § 1225(b)(1), (*see id.*), not § 1225(b)(2), as the

Government's asserts Petitioner is detained pursuant to here.

## II.    Legal Standard

28 U.S.C. § 2241 authorizes federal district courts "to grant a writ of habeas corpus

whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the

United States,'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. §

2241(c)(3)), including claims by non-citizens challenging their detention without bail, *see*

*Demore v. Kim*, 538 U.S. 510, 516–17 (2003).  "When a petitioner brings a habeas petition

pursuant to § 2241, the petitioner 'bears the burden of proving that he is being held contrary to

law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden

of proof by a preponderance of the evidence.'"  *Dzhabrailov v. Decker*, No. 20-CV-3118, 2020

WL 2731966, at *3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d 144,

158 (2d Cir. 2011)).

## III.    Discussion

The Petition raises three principal issues.  The first question is whether Sidqui, who

resided in the United States for approximately fifteen months at the time of his arrest, was

detained pursuant to (a) 8 U.S.C. § 1225(b)(1) ("§ 1225" or "§ 1225(b)"), which requires mandatory detention of "applicants for admission," to the country "who have not been admitted or paroled," (b) 8 U.S.C. § 1226(a) ("§ 1226" or "§ 1226(a)"), which provides for discretionary authority to detain other noncitizens who are "already in the country," "pending a decision on whether [they are] to be removed from the United States," *Jennings v. Rodriguez*, 583 U.S. 281, 288–89 (2018) (citing 8 U.S.C. § 1226), or (c) 8 U.S.C. § 1226(c)(1), which generally requires mandatory detention where a noncitizen "is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person."  If I find that Sidqui was detained under § 1226(a), the second question is whether his detention without an immigration judge conducting an individualized bond hearing to consider his circumstances and/or an opportunity to appeal the Department of Homeland Security's ("DHS") decision to detain him violates the Due Process Clause.[15]  If I find that Sidqui's detention violates the Due Process Clause, the third question is whether he is required to exhaust his administrative remedies, namely by seeking an appeal to an immigration judge, prior to seeking relief from me for immediate release from custody.  I consider each issue in turn below.

---

[15] The Government argues that, as a noncitizen, Petitioner's "constitutional rights are truncated" and asserts that because "section 1225(b) and related provisions expressly excludes the possibility of a bond hearing, . . . no further process is due."  (Opp'n 12.)  I disagree.  As I explain *infra*, III.A.3, Petitioner is detained pursuant to § 1226(a).  In any event, Petitioner "is not, as Respondents purport, an 'alien on the threshold of initial entry' whose due process is outlined only by statute, [Opp'n 13], but rather a noncitizen who has been living in the United States since [September 2024], during the pendency of his immigration proceedings."  *Gonzalez v. Joyce*, No. 25-CV-08250, 2025 WL 2961626, at *4 (S.D.N.Y. Oct. 19, 2025).  "Accordingly, the Fifth Amendment entitles [Petitioner] . . . to due process of law regardless of whether his presence here is lawful, unlawful, temporary, or permanent."  *Id.* (quotation marks omitted).

### A.  *Statutory Basis for Petitioner's Detention*

Given that detention under § 1225(b)(1) and § 1226(c)(1) is generally mandatory and that detention under § 1226(a) is discretionary, it follows that whichever statute Petitioner is being detained pursuant to is dispositive on the issue of whether his detention violated his due process rights.  Thus, the threshold question is whether Petitioner is detained pursuant to § 1225(b)(1)(B)(ii) or § 1226(c)(1), as the Government contends, or under § 1226(a), as indicted by Petitioner's Notice to EOIR: Alien Address and Arrest Warrant.[16]

### 1.  Overview of § 1225(b), § 1226(a), and § 1226(c)

The Government asserts that Petitioner was initially detained under § 1225(b)(1)(B)(ii). (Opp'n 7; Record of Deportable/Inadmissible Alien 3 (charging Petitioner as inadmissible to the United States under INA §212(a)(7)(A)(i)(I) and ordering his removal pursuant to INA § 235(b)(1), 8 U.S.C. § 1225(b)(1); Notice and Order of Expedited Removal 1 (same).)  Section 1225(a) provides that a noncitizen "present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1).  Applicants for admission detained under § 1225 are covered by either § 1225(b)(1) or § 1225(b)(2), but both sections generally require the detention of noncitizens without a bond hearing.  *See Jennings*, 583 U.S. at 281; *see id.* at 297 ("[N]either § 1225(b)(1) nor § 1225(b)(2) says anything whatsoever about bond hearings.").  Section 1225(b)(1) applies to noncitizens "arriving in the United States"[17] or "who have not been

---

[16] In the OTSC Hearing, I asked the Government whether § 1225 and § 1226 are mutually exclusive, *i.e.* that a noncitizen could be detained under either § 1225 or § 1226 but not both simultaneously, and the Government stated that it doesn't "necessarily agree with" that premise because "[i]f the statute says you're mandatory and another says you're discretionary, the immigration statutes cover a lot of different circumstances . . . [s]o as attorneys, it is our job to say, well, if this is applying in this context and not in that context." (Tr. 32:11-21.)

[17] The Government asserts that "Petitioner is not an 'arriving alien.' . . . Petitioner did not present himself at a port of entry, and instead unlawfully crossed the border without inspection; he is thus an applicant for admission, but not an arriving alien." (Opp'n 3 n.1.)

admitted or paroled," § 1225(b)(1), including those "initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" and these noncitizens "are normally ordered removed 'without further hearing or review' pursuant to an expedited removal process." *Jennings*, 583 U.S. at 287 (citing § 1225(b)(1)(A)(i)).  Section 1225(b)(2) "is broader" and "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)."  *Id.* (citing §§ 1225(b)(2)(A), (B)).  The only exception to the mandatory detention required by § 1225 is that "applicants for admission may be temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.'"  *Id.* at 300 (quoting 8 U.S.C. § 1182(d)(5)(A)).  "That express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released."  *Id.* (emphasis in original).  The Government does not dispute that Petitioner was paroled, (Opp'n 1, 7), and concedes that Petitioner's parole was not a humanitarian parole pursuant to § 1182, (Tr. 30:8-20).

Section 1226(a) is generally understood as the "default rule" which applies to noncitizens "already present in the United States," *i.e.*, no longer at the border, *Jennings*, 583 U.S. at 303, and provides that a noncitizen "may be arrested and detained pending a decision on whether the [noncitizen] is to be removed from the United States," § 1226(a).  *See Jennings*, 583 U.S. at 289 ("U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)" and "also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." (emphasis added)); *see also id.* at 288 ("[O]nce inside the United States . . .  an alien present in the country may still be removed" under "Section 1226").  "Pending such decision," the Attorney General (1) "may continue to detain the arrested alien" or (2) "may

release" the noncitizen on bond or "conditional parole."  § 1226(a)(1)–(2).  Thus, § 1226(a)

establishes a discretionary detention framework "and, if detained, a noncitizen may then request

a bond hearing before an immigration judge, where the noncitizen may secure his release if he

can convince the officer or immigration judge that he poses no flight risk and no danger to the

community."  *O.F.B. v. Maldonado*, --- F. Supp. 3d ---, No. 25-CV-6336, 2025 WL 3277677, at

*3 (E.D.N.Y. Nov. 25, 2025) (internal quotation marks omitted).

Section 1226(c) governs the detention of noncitizens apprehended based on certain

criminal conduct.  Like § 1225(b), § 1226(c) calls for mandatory detention.  *See* 8

U.S.C. § 1226(c)(1).  In early 2025, Congress passed the Laken Riley Act, which amended §

1226(c) and made certain noncitizens subject to mandatory detention if they are (i) inadmissible

under certain provisions in 8 U.S.C. § 1182, and (ii) "charged with," "arrested for," "convicted

of," or "admit[]" that they committed certain criminal acts, including:  "burglary, theft, larceny,

shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or

serious bodily injury to another person."  § 1226(c)(1)(E); *see* Laken Riley Act, Pub. L. No. 199-

1, § 2(1)(C), 139 Stat. 3, 3 (2025).

### 2.  The Government's Recent Change in Position

"Under the administrations of five presidents—including this one in 2016-2020—section

1225 applied to noncitizens at or near the border or those who were still seeking admission under

the legal fiction of parole; section 1226, on the other hand, applied to those noncitizens found in

the United States without legal status and therefore subject to removal."  *Alvarez Ortiz v. Freden*,

--- F. Supp. 3d ---, No. 25-CV-960, 2025 WL 3085032, at *10 (W.D.N.Y. Nov. 4, 2025); *see also*

*Savane v. Francis*, 801 F. Supp. 3d 483, 489 (S.D.N.Y. Sept. 28, 2025) ("For decades, DHS's

longstanding interpretation has been that § 1226, and not § 1225, applies to aliens who have

crossed the border between ports of entry and are shortly thereafter apprehended." (internal

quotation marks omitted)).  This is no longer the case, as is evident by the hundreds of cases

nationwide addressing the same statutory question raised here, whether a petitioner who has been

living in the United States for some time after entering the country unlawfully is detained

pursuant to § 1225 or § 1226.  Moreover, as the Government acknowledged during the OTSC

Hearing, this shift in statutory interpretation regarding § 1225 and § 1226 is a policy directive

issued by the current administration.  (*See* Tr. 16:17-24; *see also ICE Memo: Interim Guidance*

*Regarding Detention Authority for Applications for Admission*, American Immigration Lawyers

Association, https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-

authority-for-applications-for-admission (last visited Jan. 29, 2026) ("Lyons Memo").)  "On July

8, 2025, Todd Lyons, Acting Director of United States Immigration and Customs Enforcement,

issued an internal memorandum explaining that 'DHS has determined that [§ 1225] of the [INA],

rather than [§ 1226], is the applicable immigration detention authority for all applicants for

admission.'"  *Savane*, 801 F. Supp. 3d at 490 (quoting Lyons Memo).  The Lyons Memo

identifies the Government's position in this case:

> An "applicant for admission" is an alien present in the United States who has not been
> admitted or who arrives in the United States, whether or not at a designated port of
> arrival.  **Effective immediately, it the position of DHS that such aliens are subject to
> detention under [§ 1225(b)] and may not be released from ICE custody except by [§
> 1182] parole**. . . . For custody purposes, these aliens are now treated in the same manner
> that "arriving aliens" have historically been treated.  **The only aliens eligible for a
> custody determination and release on recognizance, bond, or other conditions under
> [§ 1226(a)] during removal proceeds are aliens admitted to the United States . . .
> with the exception of those subject to mandatory detention under [§ 1226(c)].**

Lyons Memo. (emphasis in original).  The Board of Immigration Appeals recently affirmed this

new interpretation in *Matter of Jonathan Javier Yajure Hurtado*, holding that all noncitizens

present in the United States without permission are to be considered "applicants for admission"

under §§ 1225(b)(1) and 1225(b)(2) and are thus subject to mandatory detention and immigration

judges "lack authority" to hold bond hearings for those noncitizens. 29 I. & N. Dec. 216, 220, 225 (BIA), 2025 WL 2674169, at *4, *9 (Sept. 5, 2025).

"Since Respondents' change in position, a growing number of courts, including courts in this district, have confronted the threshold statutory interpretation question—whether the text of § 1225 mandates detention of all noncitizens who are 'applicants for admission,' including those noncitizens who are physically present in the United States and those who were initially detained and released under § 1226(a)." *Savane*, 801 F. Supp. 3d at 490; *see e.g.*, *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. Aug. 13, 2025); *Gonzalez v. Joyce*, No. 25-CV-08250, 2025 WL 2961626 (S.D.N.Y. Oct. 19, 2025); *J.G.O. v. Francis*, No. 25-CV-7233, 2025 WL 3040142 (S.D.N.Y. Oct. 28, 2025); *Tumba*, 2025 WL 3079014; *Romero v. Francis*, No. 25-CV-8112, 2025 WL 3110459 (S.D.N.Y. Nov. 6, 2025); *Cardenas v. Almodovar*, No. 25-CV-9169, 2025 WL 3215573 (S.D.N.Y. Nov. 18, 2025); *Villegas*, 2025 WL 3215597; *Sun v. Almodovar*, No. 25-CV-9262, 2025 WL 3241268 (S.D.N.Y. Nov. 20, 2025).[18] "[T]he split is tilted, *heavily*,

---

[18] I note that the Government asserted that the petitioners in these cases were detained pursuant to § 1225(b)(2), not § 1225(b)(1), as they assert Petitioner is subject to here. Indeed, while the vast majority of the decisions in this Circuit discuss the Government's argument in the context of § 1225(b)(2) and not § 1225(b)(1), which the Government contends applies here, (Opp'n 10–12), I find the well-reasoned analysis regarding the Government's interpretation being inconsistent with the longstanding practice of immigration law in the United States, context surrounding the statutory provisions, and Supreme Court precedent, to be convincing here. *See, e.g.*, *Lopez Benitez*, 795 F. Supp. 3d at 486–91, *J.G.O.*, 2025 WL 3040142, at *3–4; *Tumba*, 2025 WL 3079014, at *3–5. The Government does not explain why it does not claim that Petitioner is detained pursuant to § 1225(b)(2) in this case, as it has in many other cases, rather than § 1225(b)(1). Perhaps the Government has taken its § 1225(b)(1) position here because of the "the overwhelming weight of authority" in this Circuit, *Cardenas*, 2025 WL 3215573, at *2, and not wanting to "add[] yet one more decision to the nearly 300 other district court decisions that have addressed this interpretive dispute and found that Section 1226 governs these types of cases," *O.F.B.*, 2025 WL 3277677, at *4. In any event, other courts have determined that similar reasoning prohibits § 1225(b)(1) from applying to noncitizens present in the country for some time after being paroled. *See Quinteros Moran v. Joyce*, No. 25-CV-9645, 2025 WL 3632895, at *3 (S.D.N.Y. Dec. 15, 2025) (rejecting the Government's argument that the petitioner was detained under § 1225(b)(1)(B)(ii) because *Jennings* "confirmed" that § 1225(b)(1)(B)(ii)'s "statutory mandate for detention extends for the entirety of consideration of an asylum application" because "*Jennings* says nothing about whether the Government may release a noncitizen on bond pursuant to § 1226(a) and then, years later, without a demonstrated change of circumstances, re-detain that same individual under § 1225(b)(1)(B)(ii)" and remarking that "blessing the Government's novel legal theory would expand § 1225(b) far beyond how it has been enforced historically, potentially subjecting millions more undocumented immigrants to mandatory detention" (internal quotation marks omitted)); *Walizada v. Trump*, No. 25-CV-00768, 2025 WL 3551972, at *11 (D. Vt. Dec. 11, 2025) (rejecting the Government's argument that the petitioner

in favor of applying the more petitioner-friendly Section 1226(a) in circumstances like those presented here." *Cardenas*, 2025 WL 3215573, at *1 (emphasis in original). Among other decisions, I find convincing the well-reasoned analysis of Judge Ho in *Lopez Benitez*, 795 F. Supp. 3d 475, Judge Subramanian in *J.G.O.*, 2025 WL 3040142, and Judge Liman in *Tumba*, 2025 WL 3079014, which all held that § 1226(a) governed the detention of a noncitizen who was initially detained at the border, released on his own recognizance, and then re-detained sometime later while living in the United States.

However, as the Government noted in its second supplemental declaration, there are two recent decisions in this Circuit that have agreed with the Government's interpretation that § 1225 authorizes the detention of noncitizens living in the United States illegally until their removal proceedings are finished. (*See* Doc. 28 at 2–3 (citing *Chen v. Almodovar* ("*Chen I*"), No. 25-

---

was detained under § 1225(b)(1)(B)(ii) because "like § 1225(b)(2), § 1225(b)(1) uses a present-progressive verb, requiring, as a condition precedent, that the alien be a person who is arriving in the United States. Only then is the mandatory detention scheme for an asylum applicant triggered. The plain reading of § 1225(b)(1) therefore requires some sort of present-tense action. This approach is buttressed by the provisions' context and . . . their place in the overall statutory scheme. Every part of § 1225 suggests that it applies to aliens who are arriving in the country." (internal quotation marks omitted)); *Coal. for Humane Immigrant Rts. v. Noem*, --- F. Supp. 3d ---, No. 25-CV-872, 2025 WL 2192986, at *29–30 (D.D.C. Aug. 1, 2025) ("Defendants' interpretation also creates an oddity that appears to contradict the statute's purpose. Under Defendants' definition of 'arriving alien,' a noncitizen who snuck into the country outside of an inspection point gets a full section 240 removal hearing as long as they have been physically present in the United States for two years. By contrast, a noncitizen who entered at an inspection point and was paroled after inspection can face expedited removal forever, regardless of how long they have been physically present in the United States. Defendants offer no explanation for such a counterintuitive result, nor does the legislative history show that Congress intended that result. . . . [T]he only way to make sense of the statutory scheme Congress created is to see that parolees fall under neither [provision of Section 1225(b)(1)]. Any other result conflicts with other aspects of the statute and regulations, Congress's evident purpose, and the ordinary meaning of the statute's words."); *Rodriguez v. Rokosky*, No. CV 25-1741, 2025 WL 3485628, at *1–2 (D.N.J. Dec. 3, 2025) (adopting the reasoning in *Coalition* to determine that the petitioner—who "was initially apprehended near the United States–Mexico border," was "paroled from custody," and "resided continuously in the United States for more than four years"—was detained under § 1226 and not § 1225(b)(1)); *Rodriguez-Acurio v. Almodovar*, --- F. Supp. 3d ---, No. 25-CV-6065, 2025 WL 3314420, at *19 (E.D.N.Y. Nov. 28, 2025) (determining that "based on the ordinary meaning of the plain text of the Arriving Alien Provision [of § 1225(b)(1)(A)(i)], [the petitioner] is not an 'arriving alien,' and therefore her detention does not fall under Section 1225(b)(1)(A)(i)" where the petitioner was initially paroled into the United States under the humanitarian parole of § 1182(d)(5)(A), but then remained in the country for three years after the expiration of her humanitarian parole and was arrested on an arrest warrant under § 1226(a)); *M.K. v. Arteta*, No. 25-CV-9918, 2025 WL 3720779, at *7 (S.D.N.Y. Dec. 23, 2025) (rejecting the Government's argument that the petitioner was detained under § 1225(b)(1) because the petitioner "was no longer arriving in the United States—he had been living here for over two years" (internal quotation marks omitted and alterations adopted)).

CV-8350, 2025 WL 3484855 (S.D.N.Y. Dec. 4, 2025) and *Candido v. Bondi*, No. 25-CV-867,

2025 WL 3484932 (W.D.N.Y. Dec. 4, 2025)).)  Moreover, I am aware of two recent decisions

issued this month, *Chen v. Almodovar* ("*Chen II*"), No. 25-CV-9670, 2026 WL 100761

(S.D.N.Y. Jan. 14, 2026), and *Weng v. Genalo*, No. 25-CV-9595, 2026 WL 194248 (S.D.N.Y.

Jan. 25, 2026), similarly agreeing with the Government's interpretation and holding that §

1225(b)(2) authorized the mandatory detention of a noncitizen present in this country for some

time after his arrival pending his removal.  None of these cases are binding on me, and I do not

find these decisions persuasive, especially against the weight of the "overwhelming, lopsided

majority" of "at least 362 cases in federal district courts" that have considered the same question

and "350 of those cases decided by over 160 different judges" have agreed that § 1226(a) applies

to noncitizens present in the country for some time.  *Barco Mercado v. Francis*, --- F. Supp. 3d --

-, No. 25-CV-6582, 2025 WL 3295903, at *4 (S.D.N.Y. Nov. 26, 2025); *see also id*. at *13,

App'x A (collecting cases).  That number has certainly increased in the two months since Judge

Kaplan undertook a comprehensive study and compiled the appendices listing 362 cases.

Moreover, the Government argued that the noncitizens in *Chen I*, *Candido*, *Chen II*, and *Weng*

were detained pursuant to § 1225(b)(2), and not § 1225(b)(1), which the Government contends

Petitioner is detained pursuant to here.  *See Chen I*, 2025 WL 3484855, at *5–6; *Candido*, 2025

WL 3484932, at *2–3; *Chen II*, 2026 WL 100761, at *9–11; *Weng*, 2026 WL 194248, at *1, *3–

5.  As an initial matter, it is worth noting that Section 1225(b)(1) does not contain the same

"seeking admission" language that § 1225(b)(2) contains.  The statutory interpretation of §

1225(b)(2) in *Chen I*, *Candido*, *Chen II*, and *Weng* led to the determination, among other

reasons, that the noncitizens there were detained pursuant to § 1225(b)(2), but is not applicable

in this case where the Government asserts that Petitioner is detained under § 1225(b)(1).  *See id.*

In any event, Judges Ho and Engelmayer recently issued well-reasoned opinions explaining some of the issues with the legal reasoning and statutory interpretation from *Chen I*, and reinforcing that the majority viewpoint is also further supported by the statutory title, the canon not to render statutory language superfluous, contemporaneously adopted implementing regulations for § 1225 and § 1226, Supreme Court precedent in *Jennings*, longstanding practice of immigration law in this country, and recent amendments to § 1226(c). *See Goorakani v. Lyons*, --- F. Supp. 3d ---, No. 25-CV-9456, 2025 WL 3632896, at *8–12 (S.D.N.Y. Dec. 15, 2025); *Yao v. Almodovar*, --- F. Supp. 3d ---, No. 25-CV-9982, 2025 WL 3653433, at *8–10 (S.D.N.Y. Dec. 17, 2025). I find those decisions persuasive and agree with that thoughtful analysis here.

In addition to the *Chen* and *Candido* decisions, the Government points to a recent BIA decision, *Hurtado*, 29 I. & N. Dec. 216, (Opp'n 23 & n.9), and two out-of-Circuit district court decisions that have followed *Hurtado*'s reasoning to find that noncitizens already in the country are detained pursuant to § 1225(b)(2), although the Government's position is that Petitioner is detained under § 1225(b)(1). (Doc. 28 at 2 (citing *Chavez v. Noem*, 801 F. Supp. 3d 1133 (S.D. Cal. 2025); *Vargas Lopez v. Trump*, 802 F. Supp. 3d 1132, 1141 (D. Neb. 2025)); *see also* Tr. 22:19-23:21 (referencing two decisions from the Southern District of California and the District of Nebraska that were decided in the Government's favor and held that noncitizens present in the country for some time could be detained pursuant to § 1225(b)).) These decisions are not binding nor, in any event, persuasive. First, the BIA decision is entitled little deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 370, 387, 400–01 (2024) (observing "that the interpretation of the meaning of statutes, as applied to justiciable controversies,' was 'exclusively a judicial function" and while "agencies have no special competence in resolving statutory ambiguities,"

"[c]ourts do" (cleaned up)).  Second, I am "not persuaded by a BIA decision that is contrary to

the statutory scheme, Supreme Court jurisprudence [namely, *Jennings*], and decades of DHS

practice.  Nor are other courts in this District."  *Villegas*, 2025 WL 3215597, at *4 (S.D.N.Y.

Nov. 18, 2025) (collecting cases).  Moreover, I have considered the two out-of-Circuit cases that

the Government cites—*Chavez* and *Vargas Lopez* (Doc. 28 at 2)—and determined that they are

not persuasive.  Furthermore, the *Vargas Lopez* court specifically noted the record did not

include an arrest warrant for the petitioner.  802 F. Supp. 3d at 1139–40.  Here, by contrast,

Petitioner was arrested pursuant to an Arrest Warrant issued under § 1226.  (*See* Arrest Warrant

("Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and

Nationality Act and part 287 of title 8, Code of Federal Regulations, [codified at § 1226] to serve

warrants of arrest for immigration violations.").)  As explained in further detail below, *infra*

III.A.3, the issuance of a warrant under § 1226 is strong evidence that Petitioner is detained

under § 1226.  *See J.U. v. Maldonado*, --- F. Supp. 3d ---, No. 25-CV-04836, 2025 WL 2772765,

at *6 (E.D.N.Y. Sept. 29, 2025) ("[T]he use of a warrant in March 2024 to arrest and detain

Petitioner is further evidence that Petitioner could only be detained pursuant to § 1226(a).");

*Lopez Benitez*, 795 F. Supp. 3d at 485 ("Respondents' own exhibits unequivocally establish that

[the petitioner] was detained pursuant to Respondents' discretionary authority under § 1226(a).

The warrants for [the petitioner's] respective arrests in 2023 and 2025 explicitly authorized those

arrests pursuant to 'section 236 of the Immigration and Nationality Act'—i.e., § 1226.").

    Although the Second Circuit has yet to address these issues, the Seventh Circuit found

that § 1226(a) applies to noncitizens discovered within the country.  *See Castañon-Nava v. U.S.*

*Dep't of Homeland Sec*., 161 F.4th 1048, 1061 (7th Cir. Dec. 11, 2025) ("U.S. immigration law

authorizes the Government to detain certain aliens *seeking admission* into the country under §§

1225(b)(1) and (b)(2).  It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." (quoting *Jennings*, 583 U.S. at 289) (emphasis and alterations in original))).  Moreover, the Seventh Circuit recognized that "the difference in treatment between a noncitizen at the border and one already in the United States fits within the broader context of our immigration law."  *Id*.  Finally, it remarked that "[i]t does not escape our notice that Defendants' recent reliance on § 1225(b)(2)(A) to detain noncitizens discovered within the United States upends decades of practice. . . . Mandatory detention of all persons illegally in the United States only became official DHS policy when Acting Director of ICE Todd M. Lyons issued an internal memorandum on July 8, 2025 explaining that the agency 'revisited its legal position' on the applicability of §§ 1225(b) and 1226(a)."  *Id*. at 1062 n.13.

### 3.  Petitioner Is Detained Pursuant to Section 1226(a)

The Government argues that because Petitioner was initially detained under § 1225(b)(1)(B)(ii) in 2024, he continues to be subject to that provision's mandatory detention requirement until his asylum application is fully adjudicated.  (Opp'n 10–12; *see also* Tr. 14:17-15:12 (explaining the basis for the Government's position that the Petitioner is being detained pursuant to § 1225 "[b]ecause that's the statutory provision he was arrested under initially. . . . And once he indicated that he had a fear of persecution and was found to be credible, [he was put] in regular deportation proceedings[.] . . . But the agency position is that just because we're arresting you, you are being held under this authority.  So yes, you get the benefit of these other provisions, that's this I'll call it the full more robust removal proceedings, but that doesn't mean your status has changed.  Your status was as it was when you were arrested.  That's what the statute says.  The statute says when you presented to the United States, and you presented you're

not legally admitted, you are still an applicant for admission.  That's what he's considered still, as an applicant for admission to the United States."); *id.* at 21:14-18 ("[T]he agency's view is that once he's arrested, and the authority he is being arrested under is 1225(b)(1) in this case, that doesn't change, even though he is being put into more formal removal proceedings which are associated with the authority to detain under 1226.").)  According to the Government, Petitioner living in the United States for fifteen months when ICE arrested him on November 7, 2025 does not impact Petitioner's status as being detained under § 1225(b)(1) despite the fact that he was not paroled under the singular parole exception to § 1225 "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), the Arrest Warrant was issued subject to § 1226, and Petitioner was detained on that basis in the Arrest Warrant.  (*See* Opp'n 10–12.)  The Government also contends that Petitioner is subject to § 1225(b)(1) because he "is statutorily deemed an applicant for admission."  (*Id.* at 1–2.)  In contrast, Petitioner urges that his detention is governed by § 1226(a) because he has been present in the country since August 2024 and thus is not a noncitizen "seeking" admission, and he was released on parole, which is only authorized under § 1226 and not § 1225.  (*See* Pet. 6; Reply 1–4.)  In other words, the Government itself authorized and therefore knew of Petitioner's release under § 1226.

The Government's argument is belied by the record in this case, which demonstrates that § 1225(b)(1)(B)(ii) is inapplicable to Petitioner's detention because the Government has continuously treated Petitioner pursuant to § 1226(a).  *See Quinteros Moran*, 2025 WL 3632895, at *3 (rejecting the Government's argument that the petitioner was detained pursuant to 1225(b)(1)(B)(ii) and determining that he was instead "detained under § 1226(a)" because "[s]ince Petitioner's initial release on bond in 2013, the Government has exclusively invoked § 1226(a) in its dealings with Petitioner").  Section 1225(b)(1)(B)(ii) mandates that if an asylum

"officer determines at the time of the [credible fear] interview that an alien has a credible fear of

persecution . . . the alien shall be detained for further consideration of the application for

asylum." § 1225(b)(1)(B)(ii). "The plain meaning of those phrases is that detention must

continue until immigration officers have finished 'consider[ing]' the application for asylum."

*Jennings*, 583 U.S. at 299 (brackets in original) (citing § 1225(b)(1)(B)(ii)); *see also id.* at 302

("In sum, §§ 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of

applicable proceedings and not just until the moment those proceedings begin."); *Matter of M-S-*,

27 I. & N. Dec. 509, 510, 2019 WL 1724249, at *1–2 (BIA 2019) ("An alien who is transferred

from expedited removal proceedings to full removal proceedings after establishing a credible

fear of persecution or torture is ineligible for release on bond. Such an alien must be detained

until his removal proceedings conclude, unless he is granted parole . . . under section

212(d)(5)(A) of the Act."). Thus, if DHS believed that Petitioner was subject to §

1225(b)(1)(B)(ii), DHS would have continued detaining him after USCIS made the credible fear

determination and DHS issued the NTA. Instead, Petitioner was "released from custody on

conditional parole/Alternative to Detention Program." (Opp'n 1.) The Government

acknowledges that Petitioner was not released pursuant to the humanitarian exception in §

1182(d)(5)(A), (Tr. 30:8-20), which was Petitioner's pathway for release under the mandatory

detention required by § 1225, *Jennings*, 583 U.S. at 300. Petitioner's release on parole, and not

the humanitarian parole in § 1182(d)(5)(A), "constitutes strong evidence" that he was released

under § 1226(a) and not under § 1225(b). *See Luna Sanchez v. Bondi*, No. 25-CV-018888, 2025

WL 3191922, at *4 (E.D. Va. Nov. 14, 2025) (finding that where the Government initially

detained a petitioner pursuant to § 1225(b)(1), "DHS's decision to release an individual on bond,

as opposed to humanitarian parole under 8 U.S.C. § 1182(d)(5)(A), constitutes strong evidence

that DHS intended to detain the individual under § 1226(a) and not under § 1225(b)"); *De Andrade v. Moniz*, 807 F. Supp. 3d. 325, 332–33 (D. Mass. 2025) (finding that, where the Government initially detained a petitioner pursuant to § 1225(b)(1) but "elected not to use [the] mechanism" of humanitarian parole under § 1182(d)(5)(A) and instead released a noncitizen on bond under § 1226(a), "[i]t cannot now turn back the clock, and neither can the Court"); *Loja v. FCI Berlin, Warden*, --- F. Supp. 3d ---, No. 25-CV-386, 2025 WL 3079160, at *2 (D. N.H. Nov. 4, 2025) (same); *Jimenez v. FCI Berlin, Warden*, 799 F. Supp. 3d 59, 66–67 (D.N.H. 2025) (rejecting the Government's argument that the petitioner, who "had been living in the United States for nearly two years pursuant to a grant of conditional parole" was detained pursuant to § 1225(b)(1) "because he remains an 'applicant for admission,' insofar as that phrase is defined to include any noncitizen 'present' in the country 'who has not been admitted'" because he was "released on conditional parole under § 1226(a), not humanitarian parole under § 1182(d)(5)(A)" and his arrest was "pursuant to a warrant expressly issued under the authority conferred upon DHS by § 1226(a)" (quoting § 1225(a)(1)); *Ceballo v. Parra*, No. 25-CV-25271, 2025 WL 3481908, at *3 (S.D. Fla. Dec. 4, 2025) (rejecting the Government's argument that the petitioner was subject to mandatory detention under § 1225(b)(1) "based on documentation related to his initial detention," explaining that the argument "misses the mark" since "Petitioner was *released* . . . and his *current* detention, as reflected in DHS's own documentation, is based on section 1226," including the fact that Government "den[ies]" that the petitioner was "granted humanitarian parole or released for significant public benefit" and that the arrest warrant was issued pursuant to § 1226) (emphasis in original) (internal quotation marks omitted)); *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *27 (holding that § 1225(b)(1)(A) "does not authorize designation for expedited removal of any noncitizen who has, at any point in time,

been paroled into the United States"); *Cf. Lopez Benitez*, 795 F. Supp. 3d at 485 (determining that the petitioner was detained pursuant to § 1226(a) and not § 1225(b)(2) because, among other reasons, he was "released [] on his own recognizance" and "[s]uch release on recognizance is not 'humanitarian' or 'public benefit' 'parole into the United States' under §§ 1225 and 1182(d)(5)(A), but rather a form of 'conditional parole' from detention, authorized under § 1226"); *J.U.*, 2025 WL 2772765, at *6 ("[N]othing in the record indicates that Petitioner was granted parole based on a case-by-case determination for urgent humanitarian reasons or public benefit. . . . Further, Respondents do not contend that any notice was provided to Petitioner lawfully revoking any such alleged parole. Thus, the fact that Respondents complied with none of the procedures prescribed by § 1182(d)(5)(A) and its implement[ing] regulations when releasing Petitioner in March 2024 and detaining him in 2025 supports the conclusion that Petitioner was not subject to § 1225(b)(2)'s mandatory detention, but rather to § 1226(a)'s discretionary detention." (internal citation omitted)); *Villegas*, 2025 WL 3215597, at *5 (The petitioner "was never paroled under § 1225. Noncitizens detained following inspection under § 1225 can only be paroled into the United States for urgent humanitarian reasons or significant public benefit. [The petitioner] was instead released on his own recognizance under § 1226(a)." (internal citation omitted)). There is nothing in the record—other than the argument made by the Government during the OTSC Hearing and the arguments contained in the Opposition— indicating that the Government believed that Petitioner was still subject to § 1225(b)(1) after he was initially detained, and the Government has no answer for what authority it initially released Petitioner pursuant to. (*See* Tr. 15:22-16:8 (noting that the NTA "says released from ICE custody on the following conditions and it just ticks off other parole" "[a]nd there is no other basis that's indicated where that parole release is coming from"); Doc. 28 at 2 ("ICE has not

been able to identify the statutory basis upon which Petitioner was released on 'parole.'  Nor do

any other documents in Petitioner's A-file identify the statutory basis of his release.").)

Furthermore, the Government has "not furnished . . . formal documentation of [Petitioner's]

release on his own recognizance, which would specify the statutory authority for [Petitioner's]

detention and discretionary release.  Given the lack of documentary evidence that [Petitioner]

was initially detained pursuant to 8 U.S.C. § 1225, and the uncontested fact of his release on his

own recognizance—which would have been impossible had he been subject to mandatory

detention—[I] credit[] Petitioner's assertion that his release was pursuant to 8 U.S.C. § 1226."

*Goorakani*, 2025 WL 3632896, at *7 n.8.

I do not accept the Government's argument in its Opposition, (Opp'n 10), and at the

OTSC Hearing, (Tr. 15:7-8 ("Your status was as it was when you were arrested."); *id.* at 21:14-

18 ("So the agency's view is that once he's arrested, and the authority he is being arrested under

is 1225(b)(1) in this case, that doesn't change, even though he is being put into more formal

removal proceedings which are associated with the authority to detain under 1226.")), that

Petitioner's status is frozen in time and remains tied to his initial arrest.  Rather, Petitioner's

"initial arrest [in August 2024] is not what is at issue in this case.  It is his 2025 arrest, which

occurred at a time when he was (and had long been) residing in the United States, and thus

subject to § 1226(a)." *Lopez Benitez*, 795 F. Supp. 3d at 491.  Here, the issuance of the Arrest

Warrant, (Doc. 14-6), pursuant to INA § 236, codified at § 1226(a), is significant evidence that

Petitioner was detained pursuant to § 1226(a) and supports the inference that even DHS

considered Petitioner detained pursuant to § 1226(a). *Luna Sanchez*, 2025 WL 3191922, at *4;

*see also Tumba*, 2025 WL 3079014, at *5 ("The Government appears to have understood that

[the petitioner] was subject to Section 1226 until the moment it had to defend Petitioner's

detention in this litigation.  The warrant for arrest served on Petitioner . . . recognizes, too, that

the arrest is 'pursuant to' Section 1226, not 1225."); *Martinez v. Hyde*, --- F. Supp. 3d ---, No.

CV 25-11909, 2025 WL 3152847, at *8 n.34 (D. Mass. Nov. 12, 2025) ("[S]ection 1226 *can*

apply, notably because ICE issued warrants both times it arrested Petitioner[.] . . .  This is

remarkable because the issuance of those warrants is consistent with detention under section

1226 but inconsistent with detention under section 1225, which does not require a warrant."

(emphasis in original)).  In fact, § 1226(a) "authorizes detention only '[o]n a warrant issued' by

the Attorney General," *Jennings*, 583 U.S. at 302 (citing § 1226(a)), and "§ 1225(b) contains no

warrant requirement," *J.U.*, 2025 WL 2772765, at *6 (citing § 1225(b)).  Thus, if the

Government believed that Petitioner was detained pursuant to § 1225, it is unlikely that they

would have issued a warrant pursuant to § 1226.  *See id.*  ("[T]he use of a warrant in March 2024

to arrest and detain Petitioner is further evidence that Petitioner could only be detained pursuant

to § 1226(a)."); *Lopez Benitez*, 795 F. Supp. 3d at 485 ("Respondents' own exhibits

unequivocally establish that [the petitioner] was detained pursuant to Respondents' discretionary

authority under § 1226(a).  The warrants for [the petitioner's] respective arrests in 2023 and 2025

explicitly authorized those arrests pursuant to 'section 236 of the Immigration and Nationality

Act'—i.e., § 1226."); *Artiga v. Genalo*, No. 25-CV-5208, 2025 WL 2829434, at *6 (E.D.N.Y.

Oct. 5, 2025) (remarking that the facts in the case were "similar to *J.U.* and *Lopez Benitez*, where

Respondents' treatment of petitioners through warrants and custody determinations authorized

pursuant to § 1226 demonstrated petitioners were detained under § 1226 because "ICE arrested

Petitioner . . . pursuant to a warrant under § 1226(a)" and "[r]egardless of what Petitioner's

designation *could have been* upon entry, Respondents thereafter consistently treated Petitioner

not as mandatorily detained as a noncitizen seeking admission under § 1225(b), but rather as

someone already in the country pursuant to Respondents' discretionary authority under §
1226(a)" (emphasis in original)); *Sun v. Almodovar*, 2025 WL 3241268, at *2 ("The Court
concludes that [the petitioner] is not subject to the mandatory detention provision of section
1225(b)(2)(A). The record demonstrates that . . . he was detained pursuant to a warrant expressly
invoking section 1226."); *Quinteros Moran*, 2025 WL 3632895, at *3 (rejecting the
Government's argument that the noncitizen was detained under § 1225(b)(1)(B)(ii) and instead
determining that he was detained under § 1226 because "after Petitioner established a credible
fear of prosecution, the Government elected to release Petitioner on bond pursuant to § 1226(a),"
the petitioner was living in the country for approximately twelve years, and the warrant for his
arrest was "pursuant to § 1226(a)").

      Counsel for the Government stated that "for decades the agency interpreted [§§ 1225 and
1226] differently," i.e., that once a noncitizen was released, that noncitizen was "under [§]
1226," but there was recently "a change in the way they are interpreting the statutes" so the
Government's position is now that noncitizens released after a credible fear determination are
still subject to § 1225(b)(1) because one's status is "as it was when [they] were arrested." (*See*
Tr. 14:17-15:12, 16:17-24.) The Government does not identify an amendment or change in the
language of the statutes at issue as the impetus behind DHS's "change in the way they are
interpreting the statutes," (*id.* at 16:24). "If Congress had wished to enact the transformation of
the immigration detention system that [Government] contend[s] it did—requiring the detention
of millions of people currently living and working in the United States—then it would have said
so more clearly." *Tumba*, 2025 WL 3079014, at *4 (quoting *Rodriguez v. Bostock*, 802 F. Supp.
3d 1297, 1332–33 (W.D. Wash. 2025)). Instead, the purported change in the way the

Government is interpreting these statutes appears to be a change in political policy to achieve a particular result rather than a change in the law or a change that can be legally supported.

In a factually similar case in the District of Massachusetts, *De Andrade v. Moniz*, in which ICE detained a non-citizen close to the border under § 1225(b)(1), released him on conditional parole under § 1226(a), and four years later re-detained him, the court found that:

> By releasing petitioner under conditional parole, the government failed to reserve its right to treat petitioner in the same manner as that of any other applicant for admission to the United States. The act of parole extinguished the legal fiction that a non-citizen who is physically present in the United States has, in fact, not effected an entry into the United States. And once having entered, petitioner can no longer be treated as an 'applicant for admission' subject to expedited removal and mandatory detention under § 1225. He must be treated like any other unlawfully 'present' non-citizen—and the lawfulness of his detention is governed by 8 U.S.C. § 1226.
>
> In substance, the government asks the Court to turn a blind eye to the circumstances of petitioner's release and the events of the last four years. It contends that his release was not an admission to the United States and did not change his status as an applicant for admission subject to expedited removal. But petitioner has been residing in Massachusetts since 2021. He is not seeking parole *into* the United States. He was already conditionally paroled into the United States. And he is still here. Congress provided a mechanism for paroling applicants for admission into the United States without changing their status. The government elected not to use that mechanism. It cannot now turn back the clock, and neither can the Court.

802 F. Supp. 3d at 332–33 (emphasis in original) (internal quotation marks and citations omitted). I find the court's analysis in *De Andrade* persuasive.

Moreover, the Government's novel and expansive construction of § 1225(b)(1) is inconsistent with the context and overall statutory scheme, historical application of the statute, and the Supreme Court's interpretation of the statutory scheme. *See Lopez Benitez*, 795 F. Supp. 3d at 486–91, *J.G.O.*, 2025 WL 3040142, at *3–4; *Tumba*, 2025 WL 3079014, at *3–5. As similar cases in this District and nationwide have found, § 1225(b) "applies to an assessment of individuals at the United States' borders and ports of entry for individuals 'seeking admission' into the country," *i.e.*, presenting at arrival, "not those 'already in the country pending the

outcome of removal proceedings,'" which are instead governed by § 1226(a).  *Gonzalez*, 2025 WL 2961626, at *4 (quoting *Jennings*, 583 U.S. at 289); *see also Tumba*, 2025 WL 3079014, at *5 ("[A] noncitizen who has entered the country, even illegally, and is apprehended by CBP after entry is not subject to the mandatory detention provision of Section 1225, and is instead subject to the discretionary detention provision of Section 1226."); *Martinez v. Hyde*, 792 F. Supp. 3d 211, 221 (D. Mass. 2025) ("[S]ection 1225 governs detention of non-citizens 'seeking admission into the country,' whereas section 1226 governs detention of non-citizens 'already in the country.'" (quoting *Jennings*, 583 U.S. at 288–89)).  Consequently, I find that Petitioner is detained under § 1226(a), and not § 1225(b)(1)(B)(ii).

I disagree with the Government's alternative argument that Petitioner is detained pursuant to § 1226(c) despite Petitioner's charges being dropped four months before he was detained, (Doc. 16-2).  First, Section 1226(c) "would have had no legal effect under the government's reading because the mandatory detention of those very same people would have been required under § 1225 without some additional crime."  *J.G.O.*, 2025 WL 3040142, at *4.  "By Respondents' understanding, all noncitizens inadmissible under 8 U.S.C. § 1182(a)(6) (which states that those like Petitioner who are present without admission are inadmissible) are *already* subject to mandatory detention.  Why, then, would Congress have thought it necessary to specifically add a provision making those noncitizens subject to mandatory detention if they are charged with certain crimes?"  *Tumba*, 2025 WL 3079014, at *4 (emphasis in original); *see also Gomes v. Hyde*, --- F. Supp. 3d ---, No. 25-CV-11571, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("If Section 1225(b)(2) applied to noncitizens who are arrested on a warrant while residing in the United States, it would render Section 1126(c)(1)(E)'s criminal conduct criterion superfluous whenever the noncitizen is inadmissible under Sections 1182(a)(6)(A) or (a)(7).

Such an interpretation, which would largely nullify a statute Congress enacted this very year, must be rejected.")  Second, "the text of § 1226(c)(1)(E)(ii) does not provide for mandatory detention where, as here, charges have been dropped."  *Rueda Torres v. Francis*, No. 25-CV-8408, 2025 WL 3168759, at *5 (S.D.N.Y. Nov. 13, 2025); *see id.* ("In defining the scope of the obligation to detain, Congress used the present tense '*is* charged with,' as opposed to '*was* or *has been* charged.' . . . Had Congress intended to make detention mandatory for anyone who *was* charged with larceny, it certainly knew how." (emphasis in original) (internal quotation marks omitted)); *see also E.C. v. Noem*, No. 25-CV-01789, 2025 WL 2916264, at *11 (D. Nev. Oct. 14, 2025) (determining that § 1226(c)'s "statutory text's reference to a person who 'is charged with' or 'is arrested' for a theft-related offense, in the present tense, cannot be read to apply to a person has previously been arrested for and charged with a crime where they have also been acquitted of the crime" and noting that mandating detention in such an instance would "violate [the noncitizen's] due process rights"); *Helbrum v. Williams Olson*, No. 25-CV-00349, 2025 WL 2840273, at *1 (S.D. Iowa Sept. 30, 2025) ("After charges are dismissed, it is no longer accurate to say that a person "is charged with" theft (present tense).  Accordingly, Petitioner is not subject to mandatory detention [under § 1226(c)(1)(E)] merely because he was charged with a crime (past tense) that has now been dismissed with prejudice.").  Indeed, I asked the Government at the OTSC Hearing whether they are aware of any case "where the immigration authorities were basing the arrest on the fact that someone was arrested and charged, although those charges had been previously dismissed when the arrest warrant was drafted" and the Government confirmed that it was "not aware of any cases discussing that scenario."  (Tr. 39:3-10.)  The Government likewise did not identify any such cases in its supplemental filings.  (*See* Docs. 21, 28.)  Instead, the Government asserted that it "respectfully

disagrees with" the *Rueda Torres* decision, argued that the text of § 1226(c)(1)(E) "authorizes

detention of a noncitizen upon him or her being 'charged with' or 'arrested for' certain crimes,"

and further argued that § 1226(c)(1)(E) "contains no additional requirement, for example, that

authority to detain the noncitizen depends on the criminal charge remaining pending after

detainment."[19]  (Doc. 28 at 3.)  For the reasons outlined above, these arguments are not

persuasive.  Accordingly, I find that § 1226(c)(1)(E)(ii) does not apply to Petitioner.

### B.  *Due Process*

The second question is whether, in detaining Petitioner under § 1226(a), the Government

violated Petitioner's due process rights.  "The fundamental requirement of due process is the

opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v.*

*Eldridge,* 424 U.S. 319, 333 (1976) (internal citations omitted).  The procedural due process

requirement applies to deportation proceedings for non-citizens as well.  *See, e.g.*, *Reno v.*

*Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens

to due process of law in deportation proceedings.").  Courts weigh three factors when

considering what due process is due:  (1) "the private interest that will be affected by the official

action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used,

and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the

Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at

335.

---

[19] The Government's position appears to be that the dismissal of charges, even if by way of acquittal, whether before or after detention, is not an impediment to detention under § 1226(c)(1)(E).  It seems to me that this position raises serious constitutional issues.

### 1. The Private Interest

The first *Mathews* factor requires consideration of Petitioner's private interests affected by the Government's action.  424 U.S. at 335.  Petitioner's interest in freedom from detention "lies at the heart of the liberty that [the Due Process] Clause protects."  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  The interest in being free from physical detention "is the most elemental of liberty interests."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention . . . is the carefully limited exception.").  "While the Government undoubtedly has authority to detain Petitioner under Section 1226, Petitioner is entitled to 'adequate procedural protections' before being deprived of [his] liberty."  *Mcdonald v. Francis*, No. 25-CV-09355, 2025 WL 3295906, at *4 (S.D.N.Y. Nov. 26, 2025) (quoting *Zadvydas*, 533 U.S. at 690).  "[T]he issue here is not the permissibility of immigration detention, but rather the process required in connection with such detention."  *Valdez v. Joyce*, --- F. Supp. 3d ---, No. 25-CV-4627, 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025) (citing *Velasco Lopez v. Decker*, 978 F.3d 842, 848 (2d Cir. 2020) ("Detention during removal proceedings is a constitutionally valid aspect of the deportation process . . . our concern is . . . with the 'important constitutional limitations' on that power's exercise.")).

Prior to the Government exercising its discretion to detain a person, "§ 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination."  *Lopez Benitez*, 795 F. Supp. 3d at 492–93 (internal quotation marks omitted); *see also Tumba*, 2025 WL 3079014, at *7 ("Due Process still requires that such discretion actually be exercised—i.e., that some determination actually be made."); *see also Jennings*, 583 U.S. at 306 ("Federal regulations provide that aliens detained under § 1226(a) receive a bond

hearing at the outset of detention.")  Section 1226(a) requires that the Government make an individualized determination based on (1) whether the noncitizen is a "danger to property or persons" and (2) whether the noncitizen is "likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8).

"[T]here is nothing to suggest that DHS exercised any discretion *at all* in detaining" Petitioner.  *Lopez Benitez*, 795 F. Supp. 3d at 494 (emphasis in original).  Petitioner asserts that he was detained by ICE on November 7, 2025 "without an individualized assessment that he posed a flight risk or danger to the community" and continues to be detained without a bond hearing.  (Pet. 1–2.)  At the OTSC Hearing, counsel for the Government was unaware of the circumstances concerning the issuance of the Arrest Warrant, including the timing of the arrest and the issuance of the Arrest Warrant, who made the decision to arrest Petitioner, and what triggered the decision to arrest Petitioner.  (Tr. 11:15-13:11, 14:1-10).  Instead, as explained *supra* III.A.3, the Government asserts that "individualized assessments provided in section 1226(a)[] are unavailable to Petitioner because his detention is statutorily mandated by section 1225(b)(1)(B)(ii)."  (Opp'n 15.)  Indeed, the Government's first explanation for the arrest was proffered in the second supplemental declaration, which explained that it was staff at the BI Inc. office who alerted ICE that Petitioner was at BI Inc.'s Queens office, which prompted ICE to prepare an arrest warrant at 26 Federal Plaza and dispatch officers to the BI Inc. office to arrest Petitioner.[20]  (Doc. 28 at 1–2.)  It was not until the Government's second supplemental declaration that the Government explained, for the first time, that Petitioner was arrested "for violating a condition of his release from custody, *i.e.*, non-compliance with the ISAP program; and for his criminal history."  (*Id.* at 2.)  However, "ICE does not know when BI Inc. provided

---

[20] As noted, the Arrest Warrant indicates it was served on Petitioner in "New York, NY," not Queens.  (Doc. 14-6.)

the notice as to Petitioner's noncompliance nor why approximately seven months elapsed after the last time Petitioner checked in (February 28) before ICE acted on this information on October 17, 2025, by terminating Petitioner from the ISAP program." (*Id.* at 1.) The Government also does not explain why it did not act earlier when it concedes that "ICE became aware of [Petitioner's] arrest on March 31, 2025." (Doc. 21 at 1.) Moreover, ICE appears to not have checked the status of the criminal charges against Petitioner, which are allegedly one of the two reasons for his arrest, (*see* Doc. 28 at 2), because it is now undisputed that those charges were dismissed prior to ICE re-detaining Petitioner. (Tr. 9:3-9 (noting that ICE officers "weren't aware of" Petitioner's criminal charges being dropped prior to re-detaining Petitioner).) It is also worth noting that, during the OTSC Hearing, I asked counsel for the Government what triggered Petitioner's arrest, and counsel for the Government "speculat[ed]" that "the fact that [Petitioner was] no longer in the [ATD] program means he would be back in detention," but did not mention Petitioner's prior arrest as a basis for Petitioner's re-detention. (*Id.* at 11:15-13:11.) "[T]he assertion that [Petitioner's] detention stems from [his March] arrest is entirely *post hoc*. Nowhere in the record did Respondents assert that Petitioner was detained under Section 1226(c), nor do any documents indicate that [his November] arrest and detention by ICE were linked to [his] dropped charges from [March], nearly eight months prior. 'The Court cannot credit Respondents' new position as to the basis for [Petitioner'] detention, which was adopted *post hoc* and raised for the first time in this litigation.'" *Rueda Torres*, 2025 WL 3168759, at *5 (quoting *Lopez Benitez*, 795 F. Supp. 3d at 486). "The utter lack of transparency here is problematic, to say the least, as it makes it impossible to determine why [Petitioner] was detained in the first place." *Lopez Benitez*, 795 F. Supp. 3d at 494.

"To be clear, the problem is not that Respondents' proffered basis in its decision to detain [Petitioner] is substantively inadequate in some respect.  DHS has wide latitude with respect to its discretion in this regard that is not subject to second-guessing by this Court.  The problem is that Respondents have not offered any explanation for [Petitioner's] detention other than their initial assertion that it is mandatory—that is, that it is *non-discretionary*.  Such an assertion is precisely the *opposite* of an exercise of discretion, which entails some sort of judgment. . . . There is simply nothing in the record to suggest that DHS engaged in any kind of exercise of discretion whatsoever with respect to [Petitioner], in contravention of the basic procedural requirements of § 1226(a) and the regulations implementing it."  *Lopez Benitez*, 795 F. Supp. 3d at 494–95 (emphasis in original).

Thus, the first *Mathews* factor weighs in Petitioner's favor.

### 2.  The Risk of an Erroneous Deprivation of Petitioner's Private Liberty Interests and the Probable Value of Additional Procedural Safeguards

The second *Mathews* factor is "the risk of an erroneous deprivation of [Petitioner's] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."  424 U.S. at 335.  In analyzing this factor, "[t]he only interest to be considered . . . is that of the detained individuals—not the government."  *Black v. Decker*, 103 F.4th 133, 152 (2d Cir. 2024).

Under § 1226(b), "[t]he Attorney General at any time may revoke a bond or parole authorized under [§ 1226(a)], rearrest the alien under the original warrant, and detain the alien." § 1226(b).  However, the BIA held that, "where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance."  *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981); *see also Saravia v.*

*Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v.*
*Sessions*, 905 F.3d 1137 (9th Cir. 2018) (DHS informed the federal district court that "DHS has
incorporated this holding into its practice, requiring a showing of changed circumstances both
where the prior bond determination was made by an immigration judge and where the previous
release decision was made by a DHS officer.  'Thus,' says the government, 'DHS generally only
re-arrests an alien pursuant to § 1226(b) after a material change in circumstances.'").  The risk of
erroneous deprivation of a noncitizen's liberty interest is "high" where the Government cannot
"articulate[] any change in circumstances between the time of the [noncitizen's] initial release
and his re-detention that now makes him a flight risk."  *Valdez*, 2025 WL 1707737, at *3; *see*
*also Lopez*, 2018 WL 2932726, at *11 (finding a risk of erroneous deprivation in the context of
re-detention "in the absence of any procedure or evidentiary findings . . . [and] changed
circumstances").

    Although the Government has not provided documentary evidence that a bond
determination was made by an immigration judge, Petitioner appeared in immigration court and
was subsequently released pursuant to § 1226(a).  (*See* James-Townend Decl. ¶¶ 10–13.)  Thus,
it necessarily follows that an individualized determination resulted in a finding that Petitioner
was not a danger to the community or a flight risk prior to Petitioner's release on September 20,
2024, despite the lack of record evidence here.  *See Lopez Benitez*, 795 F. Supp. 3d at 493
("[T]he regulations implementing § 1226(a) delegate to DHS officers the authority to grant bond
or conditional parole, and pursuant to such authority, a DHS officer must make an individualized
determination as to the appropriateness of detention based on two factors—whether the
noncitizen is a 'danger to property or persons' and is 'likely to appear for any future
proceeding.'" (quoting 8 C.F.R. § 1236.1(c)(8)); *id.* at 495 ("[W]hen DHS first released [the

petitioner] in 2023 pursuant to § 1226(a), it could not have done so validly unless it did not consider him to be a flight risk or danger to the community at that time."); *see also Rueda Torres*, 2025 WL 3168759, at *4 ("While the precise circumstances of [the petitioner's] release at that time are not entirely clear from the record, ICE could only have released her on her own recognizance under § 1226(a) following an individualized determination that she was neither a flight risk nor a danger to the community." (citing 8 C.F.R. § 1236.1(c)(8)); *Saravia*, 280 F. Supp. 3d at 1176 ("The federal government sometimes releases noncitizens on bond or parole while their removal proceedings are pending.  Release reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk.").  The Government, however, has not argued, much less presented any evidence, that its decision to re-detain Petitioner was justified by a change of circumstance.  The Government's Opposition does not reflect why Petitioner was arrested on November 7, 2025, and, during the OTSC Hearing, counsel for the Government was unaware of the reason that precipitated Petitioner's arrest, (Tr. 11:15-13:11).  However, what led to Petitioner's arrest was not a changed circumstance, it was his voluntary appearance at the BI Inc. office to fix his electronic application so that he could check-in and comply with the terms of his ATD Program, (Doc. 25), apparently not being aware that he had been terminated from that program a month prior, (James-Townend Decl. ¶ 23).  While ICE "became aware of [Petitioner's] arrest on March 31, 2025," (Doc. 21 at 1), they did not seek to re-detain Petitioner then.  Similarly, the Government alleges that Petitioner last complied with the terms of his ATD Program on February 28, 2025, and while "ICE does not know when BI Inc. provided the notice as to Petitioner's noncompliance nor why seven months elapsed after the last time Petitioner checked in (February 28) before ICE acted on this information on October 17, 2025, by termination Petition from the ISAP," (Doc. 28 at 1), ICE

did not seek to re-detain Petitioner any time between February 28, 2025 and October 17, 2025, or thereafter, until he voluntarily appeared at the BI Inc. office.  Indeed, counsel for the Government similarly could not provide any information during the OTSC Hearing about when the Arrest Warrant was created, who created it, why it was created, how it was served, or how the Government confirmed Petitioner's identity.  (Tr. 11:15-13:11, 14:1-10, 27:20-28:12.)  In the Government's second supplemental declaration, the Government contends that a staff member at BI Inc. alerted ICE that Petitioner was at BI Inc.'s office, which prompted ICE to prepare an arrest warrant at 26 Federal Plaza and dispatch officers to the BI Inc. office to arrest Petitioner. (Doc. 28 at 1–2.)  Petitioner contends that his re-detention "was part of a campaign with no individualized basis."  (Reply 8.)

The fact that Petitioner was arrested over eight months after allegedly failing to comply with the terms of his ATD Program, over seven months after he was initially arrested by the New York Police Department, and four months after the criminal charges from that arrest were dismissed—despite the Government's conceded knowledge of both the alleged failure to comply with the ATD Program and the criminal charges—highlights the risk of erroneous deprivation. ICE detained Petitioner when he voluntarily appeared at the Queens office of BI Inc.—which he had done to get his electronic application fixed so that he could attempt to comply with the terms of his ATD Program, (Doc. 25)—simply because a BI Inc. employee notified ICE that Petitioner was at their office.  (*See* Doc. 28 at 2.)  This all strongly suggests to me that Petitioner was arrested without a change of circumstances.  "The purpose of requiring an exercise of discretion prior to the decision to detain a noncitizen who is not subject to mandatory detention is to prevent an erroneous deprivation of liberty."  *Lopez Benitez*, 795 F. Supp. 3d at 495.  The Government could have employed the procedural safeguard provided in § 1226(b) prior to

revoking Petitioner's bond to avoid an erroneous deprivation of liberty, but it did not do so. Petitioner's re-detention on November 7, 2025 without any individualized assessment such as "any change in circumstances" from his initial release on September 20, 2024 "or procedure establishes a high risk of erroneous deprivation of his protected liberty interest." *Valdez*, 2025 WL 1707737, at *4 (citing *Mathews*, 424 U.S. at 335; *Lopez v. Sessions*, No. 18-CV-04189, 2018 WL 2932726, at *11 (S.D.N.Y. June 12, 2018)); *see also Artiga*, 2025 WL 2829434, at *9 (finding a risk of erroneous deprivation of a noncitizen's liberty interests when he was re-detained without a change in circumstances between the time DHS released him on bond to his re-arrest and detention); *J.U.*, 2025 WL 2772765, at *10 (same); *Luna Sanchez*, 2025 WL 3191922, at *5 ("There is a substantial likelihood that, by allowing DHS to arbitrarily revoke Petitioner's bond and detain him without any individualized findings, Petitioner will be erroneously deprived of liberty.").

Thus, the second *Mathews* factor weighs in Petitioner's favor.

### 3. The Government's Interest

The third and final *Mathews* factor considers, the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. The Government's "interests in detaining noncitizens under § 1226(a) [are] (1) ensuring that noncitizen[s] do not abscond and (2) ensuring they do not commit crimes." *Velasco Lopez*, 978 F.3d at 854; *see also Valdez*, 2025 WL 1707737, at *4 ("The Government has interests in 'ensuring the appearance of aliens at future immigration proceedings' and 'preventing danger to the community.'") (quoting *Zadvydas*, 533 U.S. at 690)). The Government argues in the alternative that if Petitioner is detained under § 1226(c), which I rejected *supra* III.A.3, then his "mandatory detention . . .

42

comports with due process" because "[t]he Circuit has recognized that such detention is justified by two 'legitimate' and 'importan[t]' interests: '(1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes that Congress has determined differentiate them from others.'" (Opp'n 21 (alteration in original) (quoting *Black*, 103 F.4th at 153).)

There is no dispute that the Government has a strong interest in being able to detain Petitioner if he is a danger or a flight risk. However, the Government has little interest in detaining a noncitizen who was previously determined to be neither a flight risk nor dangerous, *see supra* III.B.2, without an individualized determination of risk of flight and dangerousness. Here, the Government does not argue that Petitioner is a flight risk or danger to the community, (*see generally* Opp'n), and thus has "failed to show a significant interest in Petitioner's continued detention," *Valdez*, 2025 WL 1707737, at *4. The closest the Government gets is by pointing out that the last time Petitioner complied with his monthly telephonic reporting requirements was February 28, 2025, (James-Townend Decl. ¶ 19), and that Petitioner "was arrested, charged, and jailed for committing crimes involving strangulation, assault and property damage," but the Government also acknowledges that these charges were "all misdemeanors" and they were subsequently dismissed. (Opp'n 1, 8 n.5; *see also* Certificate of Disposition.) Even if the Government did attempt to argue that Petitioner is a flight risk, the record belies such an argument since Petitioner remained in the jurisdiction and was in contact with BI Inc. Moreover, any argument that Petitioner was a flight risk would be "directly at odds with the contrary . . . DHS . . . decision to release Petitioner" on parole on September 19, 2024 and the Government has "not articulated any change in circumstances between the time of Petitioner's initial release and his re-detention that now makes him a flight risk." *Valdez*, 2025 WL 1707737,

at *3.  Indeed, Petitioner's conduct in the United States largely shows the opposite of a flight risk—USCIS determined that Petitioner has a credible fear of returning to Morrocco, (James-Townend Decl. ¶ 8), he timely filed his asylum application, (*id.* ¶ 17), Petitioner has established ties in New York as his partner, who is a Green Card holder, lives in the United States and he would live with her upon his release, (Tr. 24:6-12), and he recently had a child with his partner, (*id.*; *see also* Doc. 19, Doc. 30).  The Government has not offered any evidence that Petitioner is a danger to the community.

I have "no difficulty finding that the burdens of continuing [Petitioner's] detention without any opportunity for him to seek bond are substantially higher than the burdens of providing him with minimal additional process.  First, until recently, the [G]overnment has long provided noncitizens with bond hearings before detention pursuant to § 1226(a), and there is an established process for doing so that DHS can readily follow here.  By contrast, the fiscal and administrative burdens of keeping [Petitioner] — who the record suggests is not a flight risk nor a danger to the community — detained are extremely high."  *Hyppolite v. Noem*, --- F. Supp. 3d. ---, No. 25-CV-4304, 2025 WL 2829511, at *15 (E.D.N.Y. Oct. 6, 2025).

Thus, the third *Mathews* factor weighs strongly toward Petitioner.  "Given the significant liberty interest at stake, the high risk of erroneous deprivation, and Respondents' failure to show a significant interest in Petitioner's detention, Petitioner is entitled to more process than he received," *Valdez*, 2025 WL 1707737, at *4, which appears to be no process at all, much less prior notice of arrest or detention, (Tr. 28:5-12), or an opportunity to respond.  No process is simply inadequate.  "ICE's newfound strategy to attempt to dismiss ongoing immigration court proceedings in support of an argument that they can thereby arrest and detain individuals already paroled before the court is unlawful.  ICE cannot manipulate the removal proceedings in its favor

by substituting expedited proceedings for immigration proceedings already in progress before the immigration court.  It is an abuse of process. . . . Once immigration court proceedings are underway, decisions regarding continued release are to be made by the Immigration Judge with the protections of judicial due process."  *Valdez*, 2025 WL 1707737, at *4.

### C.  *Administrative Exhaustion*

The final question is whether administrative exhaustion, in the form of an individualized bond hearing in front of an immigration judge, is required before I may grant Petitioner's requested relief of immediate release from custody.  "Under the doctrine of exhaustion of administrative remedies, a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself."  *Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995) (internal quotation marks omitted).  "While § 2241 does not include a statutory exhaustion requirement, district courts in this Circuit have recognized such a requirement as a prudential matter before immigration detention may be challenged in federal court by a writ of habeas corpus."  *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (internal quotation marks omitted).  "[I]f an exhaustion requirement is judicially imposed instead of statutorily imposed, a number of exceptions apply that allow courts to excuse a party's failure to exhaust administrative remedies," including:  "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question."  *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003), *as amended* (July 24, 2003) (internal quotation marks omitted).

The Government contends that "Petitioner should be required to exhaust his administrative remedies through a bond hearing before obtaining relief from a federal court."

(Opp'n 23.)  The Government argues that if I determine Petitioner's detention is governed by §

1226, "then Petitioner would be entitled to receive a bond hearing in immigration court for a

determination of whether he presents a danger to others or a flight risk."  (*Id*. at 21.)  This

argument is unpersuasive.  I find that at least two exceptions apply to Petitioner:  He has no

genuine opportunity for adequate relief and he has raised a substantial constitutional question.

*Villegas*, 2025 WL 3215597, at *8.

  First, a bond hearing is an inadequate remedy at this point.  As explained above, a

noncitizen detained pursuant to § 1226 is entitled to an individualized bond hearing at the outset

of detention to assess risk of flight and danger.  *Jennings*, 583 U.S. at 306 ("Federal regulations

provide that aliens detained under § 1226(a) receive a bond hearing at the outset of detention.").

Thus, providing a bond hearing to Petitioner after he has been detained for nearly three months

"is no substitute for the requirement that ICE engage in a 'deliberative process prior to, or

contemporaneous with,' the initial decision to strip a person of the freedom that lies at the heart

of the Due Process Clause."  *Gonzalez*, 2025 WL 2961626, at *5 (quoting *Lopez*, 2018 WL

2932726, at *15).  "The suggestion that government agents may sweep up any person they wish

without consideration of dangerousness or flight risk, so long as the person will, at some

unknown future date, be allowed to ask some other official for his or her release, offends the

ordered system of liberty that is the pillar of the Fifth Amendment."  *Id*.

  Moreover, "there is no doubt that — like others placed in the same position by the

government's untethered reading of § 1225 — [Sidqui's] Petition raises a substantial

constitutional question that cannot properly be adjudicated administratively."  *Villegas*, 2025 WL

3215597, at *8.  Petitioner argues that his continued detention under § 1226(a) without DHS first

making an individualized determination constitutes a violation of his due process rights.  (*See*

Reply 7–9.) "Neither an immigration judge nor the BIA has jurisdiction to adjudicate constitutional issues" and "are therefore not 'positioned [to] properly [] adjudicate [Petitioner's] claim.'" *Villegas*, 2025 WL 3215597, at *8 (quoting *Lopez Benitez*, 795 F. Supp. 3d at 497.).

Therefore, I find that, in light of the Government's failure to provide Petitioner any individualized process either prior to or contemporaneous with the deprivation of his liberty, which was formerly granted by the Government, and the Government's inability to point to any evidence of risk of flight or danger, granting the Petition without requiring administrative exhaustion is the most appropriate remedy. *Lopez Benitez*, 795 F. Supp. 3d at 469–98; *Artiga*, 2025 WL 2829434, at *9; *J.U.*, 2025 WL 2772765, at *10.

Having determined that Petitioner's procedural due process rights were violated, and that he is entitled to a writ of habeas corpus on that basis alone, I need not address his remaining arguments regarding substantive due process and the Administrative Procedure Act.

## IV.    <u>Conclusion</u>

For the reasons stated above, the Petition for a writ of habeas corpus under 28 U.S.C. § 2241 is GRANTED and the Government is ordered to immediately release Petitioner from custody.  The Government is directed to inform counsel for Petitioner as to the expected time and place of Petitioner's release and shall file a status letter to update me about Petitioner's status by February 3, 2026.

IT IS FURTHER ORDERED that Petitioner "shall not be re-detained without notice and an opportunity to be heard at a pre-deprivation bond hearing before a neutral decisionmaker, where the government will have the burden of showing that his detention is authorized under 8 U.S.C. § 1226(a)." *Hyppolite*, 2025 WL 2829511, at *17.  *Cf. Rueda Torres*, 2025 WL 3168759, at *6.

IT IS FURTHER ORDERED that the Government is ENJOINED from denying bond to Petitioner in any subsequent proceeding on the basis that he must be detained pursuant to: (1) 8 U.S.C. § 1225(b) or (2) 8 U.S.C. § 1226(c) absent a change in relevant circumstances consistent with this Opinion & Order.

IT IS FURTHER ORDERED that, if Petitioner is granted bond, the Government is ENJOINED from invoking the automatic stay provision at 8 C.F.R. § 1003.19(i)(2). *Rueda Torres*, 2025 WL 3168759, at *6.

The parties did not address Petitioner's request for attorney's fees and costs pursuant to the Equal Access to Justice Act as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, in the Petition, Opposition, or Reply. Thus, if Petitioner intends on seeking such relief, the parties shall propose a briefing schedule within 7 days of the filing of this Opinion & Order.

SO ORDERED.

Dated: January 30, 2026
       New York, New York

Vernon S. Broderick
United States District Judge